**WALDES KOHINOOR, INC., Appellant,**

v.

**ILLINOIS TOOL WORKS, Appellee.**

**Patent Appeal No. 6659.**

United States Court of Customs and Patent Appeals.

Feb. 21, 1961.

Arthur H. Seidel, Philadelphia, Pa., for appellant.

Olson & Trexler, Chicago, Ill., Charles L. Sturtivant, Washington, D. C. (Robert M. Wolters, Chicago, Ill., of counsel) for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

Waldes Kohinoor, Inc. applied on December 6, 1957, for registration of "QAF" on the Principal Register as a trademark for "fasteners of the bolt and nut type," claiming use since June 1, 1957. (Application Ser. No. 41,955.) Registration was successfully opposed by Illinois Tool Works and applicant has appealed.

The Trademark Trial and Appeal Board found (123 U.S.P.Q. 550) that opposer was a prior user of "Q Fasteners" on a "line" of quick-acting cowl fasteners of a rotary operated type, selling three types under the designations "Q–1," "Q–2," and "Q–4" and in addition was using the notation "QR" to identify quick-releasing attaching devices. "Q–Fasteners" was registered to opposer on December 24, 1957, Reg. No. 655,979, after appellant filed but before the filing

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge* O'Connell, pursuant to provisions of Section 294(d), Title 28 U.S.C.

of the opposition. The board concluded that "purchasers are likely to assume that applicant's 'QAF' fasteners are additional products in opposer's line of 'Q Fasteners'."

The board also expressed the opinion that "there is nothing in the record which would tend to indicate that in the trade and to purchasers generally it [the notation "Q Fasteners"] has any significance other than as an indication of origin for opposer's fasteners."

To set the record straight, opposer's evidence shows that it *features* in its line of "Quick Fasteners," which is the cover title on its catalog, which cover also is headed by the registered trademark "Fastex," not "Q-1," "Q-2" and "Q-4" as stated by the board, but "Q Fastener-One," "Q Fastener-Two" and "Q Fastener-Four." These designations, involving a special typographical design, are used as page headings throughout the catalog, on the various sections thereof, along with the running head *"Fastex Quick Fasteners."* In the catalog text reference is made to "Fastex Q-One" fasteners, "Fastex Q-Two" and "Fastex Q-Four" and *occasionally* the numerical designations are used, as mentioned by the board, both with and without "Fastex." The board's statement of the facts is therefore an oversimplification.

Opposer put in evidence the December 25, 1958, issue of "Machine Design" containing a special "Design Guide" section on 67 commercial "Quick-Operating Fasteners" (pages 85–100). Under the heading "Rotary-Operated Types" there appear, among over thirty other fasteners, appellant's "QAF" followed by opposer's "Q-Four," "Q-One," "QR" and "Q-Two." The juxtaposition of applicant's and opposer's marks is due, incidentally, to an alphabetical arrangement and the next item after opposer's four fasteners is the "Quick-Lock" of a third party. This evidence also serves to make it clear that appellant and opposer are competitors in the same business. The record shows also that they have the same classes of customers.

"Quick Fasteners," which is the generic name in this field, appear to get their name from the fact that many of them are locked or released by a quarter or 90° turn. "Q", being the initial letter of the descriptive word "quick," does not appear to be entirely arbitrary when applied to such goods. Opposer's catalogs on "QR" fasteners demonstrate the source of that designation by printing under it, with an asterisk reference to "QR," the words " *Quick Release Fastener," printing the initial letters we have emphasized in a lighter color than the others.

We will not speculate as to what, if any, meaning is to be attached to appellant's "QAF" mark beyond quoting the words which appear on the specimen label attached to the application which are, "Rotary, quick acting, high strength fastener."

The uses by the opposer referred to above are all in catalogs. Opposer put two price lists in evidence, one headed "Fastex* Q-2 Quick Fasteners *TM," the first asterisk being footnoted with a reference to "T.M. Reg. U.S. Pat Off." The second is headed "Net Prices Fastex Q-One* Fasteners (*Trademark)." Both lists are dated October 16, 1958, and bear the name "Fastex Division, Illinois Tool Works." The *only* evidence of use on the goods themselves is a 2⅝" by 4" card with "Fastex" on it in large letters under a list of 7 products with check boxes. The second item in the list of products is "Q Fasteners TM." The testimony shows that these cards were put in with shipments of fasteners and checked as to the name of the goods. The heading on the card is "Testing Samples Of:" and on the back is a list of patents.

The registration opposer relies on here is for a mark consisting of a large letter "Q" in double outline with the word "fasteners" in much smaller type superposed so that the letters "fas" appear inside the "Q" with the remaining letters extending over and beyond to the right. Pursuant to statute, Sec. 6 of the Lanham Act (15 U.S.C.A. § 1056), the word

"fasteners" is disclaimed apart from the mark as shown. "Fasteners" is of course completely descriptive of the goods and by itself is devoid of trademark significance. The expression "Q Fasteners" as used in the exhibits involves a typographical design entirely different from that of the registration but equally distinctive. Invariably what is emphasized as being the trademark is the complete expression "Q Fastener" and not the letter "Q" alone.

The sole issue is likelihood of confusion under section 2(d) of the statute and since the goods of the parties for the purposes of this case must be deemed to be the same, the decision turns on the effect of the parties' marks on purchasers—whether they will be likely to confuse or deceive or mislead those purchasers.

Opposer's brief sets down in ordinary type "QAF fasteners" and "Q Fasteners" in juxtaposition and then argues that they differ by only two letters, look alike, and sound alike. However, when we compare opposer's registration and actual uses with what appellant seeks to register, namely "QAF," opposer's argument is depleted of most of its force.

It is not disputed that these quick-operating or quick-releasing fasteners are sold to the automotive, aircraft, military and similar industrial users for incorporation in their products. In other words they are bought by engineers and technically sophisticated purchasing agents from catalogs, according to specifications, or through sales engineers and with the advice and assistance of such persons as opposer's witness, O. Jules Poupitch, a development engineer who spent 30% of his time in sales, who testified:

"XQ68. All of these companies, electric, auto, aircraft, appliance that use Q–1, Q–2 or Q–4 fasteners are original equipment manufacturers, aren't they? A. Predominantly so, I would think.

"XQ69. And your advertising and publicity and sales efforts are all directed at original equipment manufacturers, is that correct? A. It is.

"XQ70. And from your experience they are very careful about what they order to put into their articles of production, is that correct? A. Those that are successful I think are very careful."

Taking into account the differences between appellant's mark "QAF" and the marks registered or used by opposer, the nature of the goods and their market, the necessary competence and discrimination of the people who purchase them, and the obvious relation between the letter "Q" and the common descriptive word "quick" actually used in connection with these fasteners in the trade, we believe that there is no likelihood of confusion within the meaning of the trademark statute.

Opposer logically contends that the best evidence of likelihood of confusion is actual confusion and makes a feeble effort to persuade us there has been actual confusion. The totality of the evidence relied on is in the cross-examination of opposer's witness Poupitch as follows:

"XQ93. Have you ever heard of anyone asking for a Q fastener when he wanted a QAF fastener? A. Yes.

"XQ94. And do you have any records of any such thing? A. No."
Opposer's counsel did not follow up on this line of examination or attempt to offer any other proof of confusion. Moreover, we think the foregoing testimony is of little weight when read with the following:

"XQ45. You see no orders? A. I don't see the order. That is an administrative part of the business.

"XQ46. Then you don't know how these people order these fasteners, is that correct? A. They must order them by catalog number.

"XQ47. But you don't know that? A. No, not specifically. No.

"XQ48. And you don't know what names they use, then, either,

do you? A. Oh, yes, that I know. *Oftentimes an order comes in and asks for a Q fastener without details.* Then we have to explain to them, "What Q fastener do you want? What type?" Or this or that. In other words, the name Q has become pretty well known.

\* \* \* \* \* \*

"XQ55. When a person, a purchasing agent, chooses a Q fastener, or, let us say, Q–1 fastener, he is aware of the differences between that and the Q–2 fastener, isn't he? A. Invariably, they are familiar with the difference.

"XQ56. And also with the differences between that and the Q–4 fastener, is that right? A. That is right.

"XQ57. And the difference between that and the QR fastener, is that right? A. I would think so."

It seems to us that this testimony is not consistent with the board's view that the record contains nothing to indicate that opposer's notation "Q Fasteners" has no significance except to designate origin. "Fasteners" is purely descriptive and assuming that "Q" does indicate origin, it clearly functions in addition, together with a number, as a type designation wherein "Q" comes very close to being an obvious abbreviation of the descriptive word "quick."

Under the above indicated market conditions we see no likelihood of purchaser confusion, deception, or mistake.

The decision below is *reversed.*

Reversed.